UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:18-CV-00341-GNS-CHL

ROBERT CORNELIUS                                                    PLAINTIFF

v.

CITY OF MOUNT WASHINGTON, KENTUCKY, et al.              DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the parties' Cross-Motions for Summary Judgment (DN 66, 67, 68). The matters are ripe for adjudication. For the reasons discussed below, Defendants' Motion for Summary Judgment (DN 66) is **GRANTED IN PART** and **DENIED IN PART**, Plaintiff's Motion for Summary Judgment (DN 68) is **DENIED**, and Defendants' Motion for Summary Judgment (DN 67) is **GRANTED**.

I.        <u>STATEMENT OF FACTS</u>

On the evening of June 2, 2017, Plaintiff Robert Cornelius ("Cornelius"), was sitting on his front porch with his girlfriend, Madelyn Cornman ("Cornman"), when Defendant Jessie Bratcher, who was employed as a Mount Washington Police Officer ("Officer Bratcher"), drove his police cruiser down the street in front of Cornelius' house to address an unrelated matter. (Cornelius Dep. 30:15-31:1, 34:5-9, May 9, 2019, DN 65-1). When Cornelius saw the activated lights on Officer Bratcher's patrol car, he lost consciousness and began suffering a seizure. (Cornelius Dep. 31:1-3). Cornelius has no memory of what happened next. (Cornelius Dep. 31:1-3). Cornman saw that Cornelius was "out of it" and foaming at the mouth, so she ran to Officer Bratcher's cruiser for help. (Cornman Dep. 18:5-6, 25:24-25, May 10, 2019, DN 65-3). Officer Bratcher left his cruiser and, upon arriving at the porch, observed that Cornelius appeared to be

having a seizure.  (Bratcher Dep. 6:22-7:2, Aug. 20, 2019, DN 65-4).  Officer Bratcher placed a cushion behind Cornelius' head to prevent injury.  (Bratcher Dep. 7:3-7).

According to Officer Bratcher, he then noticed Cornelius making growling, animal-like noises as Cornelius tried to grab ahold of Officer Bratcher and attack him.  (Bratcher Dep. 7:8-10). Cornelius began using his arms, hands, and feet in an aggressive manner while Officer Bratcher was trying to protect Cornelius' head.  (Bratcher Dep. 11:15-20, 16:1-3).  Officer Bratcher was not sure if Cornelius was trying to pull himself up or pull Office Bratcher down.  (Bratcher Dep. 20:3-7).  At this point, Cornelius' eyes were open, so Officer Bratcher suspected Cornelius was on drugs and knew what he was doing.  (Bratcher Dep. 12:6-15, 27:23-25).  Officer Bratcher, therefore, backed away and removed a few metal objects from the porch that might be used as weapons. (Bratcher Dep. 7:10-14).

Cornelius then pulled Cornman down onto the porch and got on top of her.  (Bratcher Dep. 7:17-19).  Officer Bratcher testified that Cornman screamed "stop biting me!" though he never saw Cornelius actually bite Cornman.  (Bratcher Dep. 13:22-24).  At the same time, Defendant, Mount Washington Police Officer Mike Stump ("Officer Stump") arrived as backup and heard Cornman's "blood-curdling" scream.  (Stump Dep. 7:6-8, 39:11-15, DN 65-5).  Officer Stump saw Cornelius jump up and lunge across the patio furniture in a violent fashion, flailing and punching like he was trying to kill someone.  (Stump Dep. 7:15-25).  After Stump saw Bratcher unholster his taser, he began moving Cornelius into the front yard.  (Stump Dep. 8:5-11).  Officer Stump states he used a "bear hug" to move Cornelius, and eventually got Cornelius away from Cornman. (Stump Dep. 8:10-22).  All the while, Cornelius was trying to headbutt Stump and break free from the hold.  (Stump Dep. 8:21-3).

After Officer Stump moved Cornelius into the yard, Cornelius whipped his head around and Stump was unable to hold him any longer.  (Stump Dep. 9:1-3).  Instead, Stump used a palm-heel strike to create some distance between them.  (Stump Dep. 9:4-7).  Cornelius was still out of control and Stump thought Cornelius was getting ready to come after him, so Stump told Officer Bratcher to tase Cornelius.  (Stump Dep. 9:8-11, 21:11-12).

Officer Bratcher deployed the taser's probes and discharged one full five-second cycle.  (Bratcher Dep. 8:6).  According to both officers the first deployment was ineffective, as Cornelius could still move all his extremities, and Bratcher was unable to handcuff him.  (Bratcher Dep. 8:7-11; Stump Dep. 9:17-24).  The officers were shouting verbal commands for Cornelius to comply, but he continued to resist.  (Bratcher Dep. 73:5-25; Ford Dep. 46:3-10, Feb. 28, 2020, DN 65-8).  Bratcher testified he did not know whether Cornelius was incapable of hearing their commands or just ignoring them.  (Bratcher Dep. 73:5-25).  An off-duty sheriff's deputy, Trevor Ford ("Deputy Ford"), arrived at the scene and observed taser barbs attached to Cornelius.[1]  (Stump Dep. 10:2; Ford Dep. 35:2-6).  Ford testified that he could tell that the taser had been ineffective because Cornelius was refusing the officers' commands to stop resisting.  (Ford Dep. 37:11-18).  Deputy Ford took over for Officer Bratcher who was trying to prevent Cornelius from hitting, kicking, and biting.  (Ford Dep. 38:10-12, 51:18-22).  Ford described Cornelius' demeanor like a zombie from *The Walking Dead*,[2] as his eyes were extremely wide open, and he was trying to bite them.  (Ford Dep. 40:20-41:3).

Officer Bratcher discharged his taser for another five-second cycle.  (Ford Dep. 35:11; Stump Dep. 10:11-16).  Deputy Ford then helped Officer Stump remove Cornelius' arms from

---

[1] Officer Bratcher testified that Deputy Ford arrived after Cornelius was arrested and was not involved in subduing him.  (Bratcher Dep. 28:23-25).

[2] *The Walking Dead* (AMC Studios, *et al.*).

under his chest and handcuff him.  (Stump Dep. 10:11-16).  Stump states Cornelius was tased just long enough to get his hands together and cuffed, but does not remember how long the taser was activated after the first discharge.  (Stump Dep. 10:11-16).  All three officers testified Officer Bratcher discontinued the use of his taser after Cornelius was handcuffed.  (Stump Dep. 93:9-13; Bratcher Dep. 60:2-4; Ford Dep. 36:16-21).  Bratcher maintains he discharged the taser only twice, while Cornelius was still flailing around, screaming, growling like an animal, and swinging his arms and legs.  (Bratcher Dep. 8:14-18, 21:18-23).  Deputy Ford recalled that Cornelius was still trying to bite people, even after the paramedics arrived.  (Ford Dep. 38:11-12).

Cornman tells a different story. According to Cornman, when she came back to the porch after asking Officer Bratcher for help, Cornelius was reaching to grip something like he was trying to pull himself up.  (Cornman Dep. 26:1-4).  Cornman went to the corner of the porch to help Cornelius and hold onto him.  (Cornman Dep. 29:9-10).  Cornman testified Cornelius never bit her, and that the only time she screamed was when she later saw officers hurting him.  (Corman Dep. 53:7-11, 55:11-25).  Instead, Cornman states that as she reached for Cornelius, he grabbed ahold of her and she fell, but only because she was shocked and that Cornelius never hurt her.  (Cornman Dep. 22:19-23:4).  In fact, after she fell, Cornelius' dog ran out of the house, and Cornman was able to get up and bring the dog back inside.  (Cornman Dep. 23:4-7).  Although Officer Stump states he was attempting to move Cornelius away from Cornman, Cornman testified Officer Stump was never on the porch.  (Cornman Dep. 58:2-7).

After Cornman brought the dog inside, she saw that Cornelius was in the yard, but she did not know how he got there.  (Cornman Dep. 53:12-25).  Cornman states Officer Stump arrived when she came back outside, and that he and Officer Bratcher were circling and wrestling Cornelius, who was still standing.  (Cornman Dep. 37:12-16).  Cornman saw that Cornelius

seemed confused; that he was using his elbows like a chicken to get the officers off him; that she never saw him kick at the officers; and that both officers were trying to handcuff Cornelius and were able to get on top of him.  (Cornman Dep. 37:17-25, 38:11-16).  Cornman notes she is not entirely sure about the chronology of the events because she was on the phone calling Cornelius' mother and other people on the scene were asking her questions.  (*See* Cornman Dep. 39:9-13, 63:6-7).

While Cornelius was still in the grass, Sergeant Tim Morris ("Sergeant Morris"), Stump and Bratcher's supervising officer, arrived and asked Cornman to go inside the house for questioning.  (Cornman Dep. 63:8-11; Morris Dep. 16:1-25, Aug. 20, 2019, DN 65-6).  After Sergeant Morris spoke with her, Cornman returned outside and saw the officers on top of Cornelius with their knees on his neck.  (Cornman Dep. 47:10-15).  Cornman testified that Officer Bratcher then got to his feet and was handcuffing Cornelius, who was on his knees and not resisting. (Cornman Dep. 51:1-10).  Officer Bratcher then backed up, pulled out his taser, deployed the barbs, and discharged a single round into Cornelius' back while he was handcuffed only a foot away from Cornman.  (Cornman Dep. 51:13-16, 67:9-11, 69:13-24).  Cornelius fell to the ground and was unable to resist from that moment on.  (Cornman Dep. 51:7-8).

Cornelius eventually regained consciousness after he was placed on a gurney, and was later taken to the hospital.  (Cornelius Dep. 31:1-3).  The officers prepared internal reports documenting the incident but failed to recover any evidence from the scene or record formal witness statements. (*See* Defs.' Mot. Summ. J. Ex. 1, DN 66-2; Defs.' Mot. Summ. J. Ex. 2, DN 66-3).  After the incident, a criminal complaint was filed against Cornelius for assault and resisting arrest.  (*See* Morris Dep. Ex. 6, at 135).  According to a report generated from the taser used on the night of the

incident, Officer Bratcher activated the taser four times, each cycle of which lasts five seconds.[3] (Pl.'s Mot. Summ. J. Ex. 9, DN 68-11).

Cornelius sued Officers Bratcher and Stump;[4] their supervisors, Sergeant Morris, and Mount Washington Police Chief Roy Daugherty ("Chief Daugherty"); and the City of Mount Washington ("City") under 42 U.S.C. § 1983 and state law.  (Am. Compl. ¶ 1, DN 27).  Cornelius brought claims for violation of the Fourth and Eighth Amendment, negligence, battery, and outrage against Officers Bratcher and Stump.  (Am. Compl. 6-9).  Cornelius also brought an abuse of process claim against Officer Bratcher.  (Am. Compl. 10).  As to the City, Cornelius seeks to impose joint and several liability for each of the claims, and raises an additional claim under *Monell* for negligent hiring, training, and supervision based on the conduct of Chief Daugherty and Sergeant Morris.  (Am. Compl. 8-9).  Cornelius seeks compensatory and punitive damages.[5] (Am. Compl. ¶¶ 52-53).  Defendants moved for summary judgment on Cornelius' claims against Officers Stump and Bratcher, and separately on his claims against Sergeant Morris, Chief Daugherty, and the City.  (Defs.' Mot. Summ. J., DN 66; Defs.' Mot. Summ. J., DN 67).  Cornelius cross-moved for summary judgment but only on his Fourth Amendment claim arising out of Officer Bratcher's third and fourth taser discharge, and against the City for *Monell* liability.  (Pl.'s Mot. Summ. J., DN 68).

---

[3] The log shows there were five seconds between the first and second shock, two seconds between the second and third, and five seconds between the third and fourth.

[4] Cornelius also sued Deputy Ford, who was subsequently dismissed from the case.  (*See* Mem. Op. & Order, DN 61).

[5] Defendants moved for summary judgment on the imposition of punitive damages against the City.  (Defs.' Mem. Supp Mot. Summ. J. 20, DN 20-1).  Cornelius failed to respond to this argument, and thus the Court grants summary judgment on this claim.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *See id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This standard of review remains the same for reviewing cross-motions for summary judgment. *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (citation omitted).

## III.    DISCUSSION

### A.    Individual Officers:  Fourth Amendment

Cornelius alleges the individual officer-Defendants violated his Fourth Amendment right to be free from excessive force. At the heart of both parties' motions is Defendants' reliance on qualified immunity.[6] (Pl.'s Mem. Supp. Mot. Summ. J. 19, DN 68-1; Defs.' Mem. Supp. Mot.

---

[6] Defendants also moved for summary judgment on Cornelius' Eight Amendment claim because excessive force claims are governed by the Fourth Amendment. (Defs.' Mem. Supp. Mot. Summ. J. 10-11). As Cornelius did not respond to this argument, the Court grants summary judgment on this claim. *See Brown*, 545 F. App'x at 372.

Summ. J. 11, DN 66-1).  Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  The plaintiff has the burden to prove that a defendant is not entitled to qualified immunity.  *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999) (citation omitted).  To overcome an officer's claim of qualified immunity, a plaintiff must establish that:  (1) the facts in light of the non-moving party demonstrate that the officer's conduct violated a constitutional right; and (2) that right was clearly established.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).

"The Supreme Court recently clarified the summary-judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is 'a question of fact best reserved for a jury.'"  *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (citation omitted). "At the summary judgment stage . . . once [the Court] [has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [Defendants'] actions . . . is a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis omitted).

The Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989), "set out a three-factor test to aid the courts in assessing objective reasonableness in the typical situation of a law-enforcement officer accused in a civil suit of using excessive force."  *Est. of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).  Those three factors are:  "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396 (citation omitted). When applying these factors, the Sixth Circuit noted "[c]ases addressing qualified immunity for

taser use fall into two groups." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012).   "The first [group] involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers." *Id.*   "In the second group of cases, a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained." *Id.* at 496.

Regarding Defendants' motion, when viewed in a light most favorable to Cornelius, this case would fall into the second group.[7]   In Defendants' motion, they primarily rely on their version of events and disregard Cornman's account that Officer Bratcher tased Cornelius after handcuffing him as "simply incredulous".   (Defs.' Mem. Supp. Mot. Summ. J. 17).   The Court is not at liberty to be so flippant.   In this instance, there are two completely divergent descriptions of the facts. Taking the facts in the light most favorable to the non-moving party, there is a factual dispute that precludes summary judgment.   Cornman testified that she was standing right next to Cornelius, who was handcuffed, when Officer Bratcher tased him.   (Cornman Dep. 51:13-16, 67:9-11, 69:13-24).

---

[7] In their motion, Defendants do not distinguish among excessive force claims brought against either officer, but instead move for summary judgment *in toto*.   Cornelius, however, moved for summary judgment only against Officer Bratcher.   "Each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008) (citation omitted).   As the Sixth Circuit has noted:

> [A] police officer who *fails* to act to prevent the use of excessive force may still be held force may still be held liable where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."

*Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (citation omitted).   Even though Cornman states she does not know where Officer Stump was at the moment Cornelius was shocked, Officer Stump testified he directed Officer Bratcher to discharge his taser and was part of the fray attempting to subdue Cornelius.   (Defs.' Mem. Supp. Mot. Summ. J. 5).   Accordingly, the Court proceeds against both officers in Defendants' motion.

"Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since 'the right to be free from physical force when one is not resisting the police is a clearly established right.'" *Cockrell*, 468 F. App'x at 496 (citation omitted); *see also Thomas v. Plummer*, 489 F. App'x 116, 126-30 (6th Cir. 2012) (finding excessive force clearly established when an officer tased the plaintiff after she ceased verbal resistance, dropped to her knees, and put her hands up).

Cornelius also maintains the officers used excessive force regarding how they handled him after the arrest.  (Pl.'s Resp. Defs.' Mot. Summ. J. 21, DN 70).  Defendants argue whether Cornelius' movements after arrest seemed involuntary to other witnesses, the Court must only consider the facts knowable to them.  (Defs.' Reply Mot. Summ. J. 3, DN 74).  However, based upon the accounts of some of the witnesses and drawing inferences in favor of Cornelius, reasonable officers on the scene would *not* have viewed Cornelius' conduct as "some outward manifestation—either verbal or physical—on the part of the suspect [that] suggested volitional and conscious defiance . . . ." *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013). Accordingly, the result remains the same.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("We have also consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right."); *see also Wysong v. City of Heath*, 260 F. App'x 848, 855-58 (6th Cir. 2008).

Defendants next contend the objective facts show that Cornelius was suffering a medical emergency that required a reasonable use of force to ameliorate an immediate threat of serious harm to himself or others.  (Defs.' Mem. Supp. Mot. Summ. J. 17).  Defendants rely on *Estate of Hill by Hill v. Miracle*, 853 F.3d 306 (6th Cir. 2017), where the Sixth Circuit distinguished situations when officers are faced with "active resistance" under *Graham*, from situations that "do[] not fit within the *Graham* test because the person in question has not committed a crime, is

10

not resisting arrest, and is not directly threatening the officer . . . ." *Id.* at 314. In such circumstances, the Sixth Circuit directs the court to ask:

> (1)    Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
> (2)    Was some degree of force reasonably necessary to ameliorate the immediate threat?
> (3)    Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?
> If the answers to the first two questions are "yes," and the answer to the third question is "no," then the officer is entitled to qualified immunity.

*Id.* at 314.

There is no question that Cornelius was suffering a medical emergency that posed a risk of harm to at least himself, and as Cornelius was convulsing and uncontrollable, some degree of force was reasonably necessary to ameliorate the immediate threat. The real question is not whether force was reasonably necessary, but whether the *amount* of force was reasonable and whether the *timing* of the force was reasonable. In *Miracle*, for example, the Sixth Court found the single use of a taser in the drive-stun mode was not excessive because "[f]our paramedics were unable to physically restrain [the plaintiff], whose health was rapidly deteriorating and who was unresponsive to [the officer's] command to 'relax.'" *Miracle*, 853 F.3d at 315. By contrast, according to Cornman, Officer Bratcher shocked Cornelius *after* handcuffing him, but before the paramedics arrived to provide medical care. When viewed in a light most favorable to him, witnesses on the scene indicate Cornelius was incapable of resisting and was handcuffed at least during one taser-shock.

The evidence viewed in the light most favorable to Cornelius also would support a finding that Defendants violated a clearly established right. "[T]o satisfy the second prong of the standard, plaintiff must show that the right was clearly established in a 'particularized sense,' such that a

reasonable officer confronted with the same situation would have known that using [] force would violate that right." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted). "[T]he Court can consider more than merely the factual context of a prior case: 'the general reasoning that a court employs' also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional.'" *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (citation omitted). The Court finds existing caselaw in 2017 provided Defendants fair notice they could not tase Cornelius after subduing him, when he did not pose a threat to himself, paramedics, officers, or others, regardless if the altercation arose in the medical-emergency context or criminal context. *See, e.g.*, *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) ("Against the backdrop of existing law, Officer Aurilio could not reasonably have believed that use of a Taser on a non-resistant subject was lawful."). The Court, therefore, denies Defendants' motion.

In Cornelius' motion, he recognizes the numerous factual disputes presented and only moves for summary judgment against Officer Bratcher for the third and fourth shock. (Pl.'s Mot. Summ. J. 18). When viewed in a light most favorable to Defendants, however, this case falls into the group of cases which "involves plaintiffs tased while actively resisting arrest . . . ." *Cockrell*, 468 F. App'x at 495. Cornelius attacked both Officer Bratcher and Cornman, and later attempted to headbutt Officer Stump. According to Defendants' testimony, use of the taser was justified to subdue Cornelius due to the threat presented and because a reasonable officer would have believed Cornelius was "actively resisting." *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 613 (6th Cir. 2020) ("These actions reflect a 'deliberate act of defiance using one's own body.'" (citation omitted)).

Cornelius seeks summary judgment because Officers Bratcher and Stump admit Cornelius was no longer "actively resisting" after the second shock, and yet the taser log reported four discharges. (Pl.'s Mem. Supp. Mot. Summ. J. 22). Defendants argue the officers may not have known the exact number of taser activations. (Defs.' Resp. Pl.'s Mot. Summ. J. 15, DN 69). A reasonable jury could, in a light most favorable to Defendants, accept the log's report and infer the officers simply forgot the exact number of discharges, but that Cornelius was not shocked after the handcuffs were on him. *See Wheeler v. Graves Cty.*, No. 5:17-CV-38-TBR, 2019 WL 1320506, at *4 (W.D. Ky. Mar. 22, 2019) ("[N]either the Jury, nor the Court in ruling on a motion for summary judgment, may speculate. However, the Jury may, and the Court at summary judgment must, draw logical inferences in [the non-moving party's] favor." (internal citations omitted) (citation omitted)).

Depending on whose story is accepted, Defendants may be entitled to qualified immunity. Therefore, both Cornelius' and Defendants' motions for summary judgment are denied with respect to the issue of qualified immunity. *See Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010) ("The issue of qualified immunity may be submitted to a jury [] if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'" (alteration in original) (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007))).

**B.**   **Individual Officers: State Law Claims**

Defendants also moved for summary judgment on Cornelius' state law claims.[8] (Defs.' Mem. Supp. Mot. Summ. J. 20-24). While Cornelius opposes Defendants' motion, he did not move summary judgment on these claims.

---

[8] Cornelius failed to respond to Defendants' motion for summary judgment regarding his outrage claim under Kentucky law, therefore, the Court grants summary judgment on this claim. *See Brown*, 545 F. App'x at 372.

1.    *Battery*

Cornelius brings a claim of battery against Officers Bratcher and Stump because he did not consent to any contact on the night of the incident.  Battery under Kentucky law is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him . . . ."  *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (citations omitted).  Under Kentucky law, "[t]he use of excessive force by a police officer constitutes the intentional tort of battery."  *Ali v. City of Louisville*, No. 3:03CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006).  Defendants raise qualified immunity as a defense.  (Defs.' Mem. Supp. Mot. Summ. J. 20).  Although qualified immunity under Kentucky does not mirror its federal counterpart, the result remains the same.  *See Woodcock v. City of Bowling Green*, 679 F. App'x 419, 425 (6th Cir. 2017) ("[C]ourts have held that 'this inquiry tracks the inquiry for objective reasonableness and qualified immunity.'" (citation omitted)).  Ultimately, there is a genuine dispute as to whether Officer Bratcher used more force than was reasonably necessary during the arrest.  Defendants' motion, is therefore, denied as to this claim.

2.    *Negligence*

"Because the Court concludes that Plaintiffs have pointed to sufficient evidence of intentionality for battery purposes, it conversely finds that there is insufficient evidence to support an inconsistent negligence theory."  *Mills v. Owsley Cty.*, 483 F. Supp. 3d 435, 479 (E.D. Ky. 2020).  "When an officer uses more force than is necessary, he commits an intentional act."  *Durmov v. Univ. of Ky.*, No. 5:12-CV-258, 2013 WL 488976, at *2 (E.D. Ky. Feb. 7, 2013) (citation omitted).  "Thus, when an officer uses excessive force, he can be liable for the intentional

14

tort of battery, but he cannot be liable for negligence." *Id.* The Court, therefore, grants Defendants' motion as to Cornelius' negligence claim.

### 3.    *Abuse of Process*

Cornelius claims Officer Bratcher abused process when he filed a criminal complaint against Cornelius despite knowing Cornelius was incapable of committing a crime.  (Pl.'s Resp. Defs.' Mot. Summ. J. 23).  A plaintiff must prove two elements to succeed on an abuse of process claim:  "(1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citations omitted).  As to the second element, a plaintiff must plead "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process," but there is no abuse of process claim "where the defendant has done nothing more than carry out the process to its authorized conclusion *even though with bad intentions*." *Id.* at 394-95 (emphasis added) (citation omitted).  Generally, "obtaining an indictment alone, even with an ulterior purpose, is no abuse of process.  There must be some act or use of the process to secure a collateral advantage outside the criminal proceeding." *Sprint Commc'ns Co., L.P. v. Leggett*, 307 S.W.3d 109, 114 (Ky. 2010).

In an attempt to show a willful act, Cornelius asserts "Defendants are attempting to admit [his] charges into evidence to bolster their defense in this civil action even after admitting [Cornelius] did not have the proper state of mind to commit the offenses, they charged him with." (Pl.'s Resp. Defs.' Mot. Summ. J. 23).  Without evidence, Cornelius' argument at most shows Officer Bratcher's ulterior purpose, but not a willful act.  Rather, "[i]n the typical abuse of process claim, the plaintiff satisfies the willful act element by showing that the defendant directly bargained with him, using the wrongful process as leverage." *Sanders v. City of Pembroke,* No.

15

5:19-CV-23-TBR, 2020 WL 4572360, at *16 (W.D. Ky. Aug. 7, 2020); *see, e.g.*, *Williams v. Sandel*, No. 08-04-DLB, 2010 WL 11538240, at *2 (E.D. Ky. Feb. 12, 2010) ("Plaintiff . . . alleges that the Commonwealth Attorney's office 'indicated to criminal defense counsel . . . the charges would be dropped if Plaintiff dropped this civil lawsuit.'" (citation omitted)).  In the Complaint, Cornelius alleges "[s]ince June 12, 2016, no one has attempted to correct or withdraw the false criminal complaint despite multiple requests by Mr. Cornelius's counsel to do so."  (Am. Compl. ¶ 23).  Defendants answered, "[t]hese Defendants . . . affirmatively state that such 'attempts' would be improper."  (Answer ¶ 21, DN 33).  "In other words, Plaintiff critiques the charge, but . . . [w]ithout proof tying the use of process to a collateral effect—and [the plaintiff] *offers nothing but speculation here*—the claim falters."  *Powell v. Fugate*, 364 F. Supp. 3d 709, 731 (E.D. Ky. 2019) (emphasis added) (citation omitted).  Without any evidence that Defendants acted willfully in using the criminal process as leverage, Cornelius' abuse of process claim must be dismissed.

## C.    **Supervisory and *Monell* Liability**

Cornelius finally attempts to impose *Monell* liability against the City.[9]  (Pl.'s Mem. Supp. Mot Summ. J. 18).  Defendants moved for summary judgment arguing Cornelius failed to adduce sufficient evidence to prove *Monell* liability under either a failure to train, failure to supervise, or negligent hiring theory.[10]  (Defs.' Mem. Supp. Mot. Summ. J. 9).  Furthermore, Defendants moved

---

[9] Cornelius' Complaint references unlawful conduct by Sergeant Morris and Chief Daugherty, but nowhere in his motions does he argue for "supervisory" liability.  Under Section 1983, a supervisor may only be held liable for his own conduct, and not on a theory of *respondeat superior*.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  Cornelius essentially claims the City is liable for the conduct of its employees under *Monell* liability.  (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 1, 7-10, DN 71; Pl.'s Mem. Supp. Mot. Summ. J. 18).  The Court will, therefore, address this question only, and as it grants summary judgment in favor of the City, it will do the same for claims against Sergeant Morris and Chief Daugherty, which Cornelius failed to address separately.

[10] Initially, Defendants claim the Complaint failed to state a claim upon relief could be created.  (Defs.' Mem. Supp. Mot. Summ. J. 8).  At this stage, Defendants' argument is irrelevant as "challenges to the sufficiency of the pleadings must be asserted in a motion to dismiss under Rule

for summary judgment on any purported state law negligent hiring, training, or supervision claim. (Defs.' Mem. Supp. Mot. Summ. J. 16).  Cornelius cross-moved on the "narrow issue" of "whether Mt. Washington's investigation and reporting regarding this incident was so poor as to constitute a 'policy or custom' enabling these types of violations."[11]  (Pl.'s Mem. Supp. Mot Summ. J. 18).

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978), municipalities can be held liable for constitutional violations caused by an official policy.  A plaintiff bringing a *Monell* claim must show that:  (1) his or her rights were violated; and (2) the municipality was responsible for the violation.  *See Doe v. Claiborne Cty. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  Although there is a dispute as to whether Officers Bratcher and Stump violated his rights, Cornelius must further show the City is responsible for his injury.  Municipalities cannot be held liable for violations of rights by their employees under a theory of *respondeat superior*.  *Id.* at 507.  The plaintiff must show that the injury arose from an officially executed policy or the toleration of a custom that lead to or resulted in the injury.  *Id.*

### 1.     *Failure to Train and Supervise*

Cornelius claims the City failed to train the officers on the proper use of a taser and to supervise Officer Bratcher in his use of force.  (Pl.'s Resp. Defs.' Mot. Summ. J. 1).  To succeed on a failure to train or supervise claim, Cornelius must prove:  "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's

---

12(b)(6) rather than on summary judgment . . . ."  *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 n.2 (6th Cir. 2014) (citation omitted); *see also Dynasty Apparel Indus. Inc. v. Rentz*, 206 F.R.D. 603, 606 (S.D. Ohio 2002) ("A motion for summary judgment is not the proper vehicle with which to test the legal sufficiency of a pleading.").

[11] Cornelius failed to respond to Defendants' motion regarding any purported negligent hiring claim, under federal or state law, and thus the Court grants Defendants' motion for these claims. *See Brown*, 545 F. App'x at 372.

deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citation omitted).  "[A] negligent failure to adequately supervise, train or control", however, is insufficient to establish a municipalities deliberate indifference.  *Hays v. Jefferson Cty.*, 668 F.2d 869, 873 (6th Cir. 1982).

As to the City's failure to train, Cornelius maintains the generally accepted standards for the use of force are articulated in guidelines issued by the United States Department of Justice and Police Executive Research Forum.[12]  (Pl.'s Resp. Defs.' Mot. Summ. J. 2).  Cornelius admits the City's official policy "largely mirrors that of the recommended guidelines . . ." but argues the unofficial custom was to the contrary.  (Pl.'s Resp. Defs.' Mot. Summ. J. 3).  As Cornelius does not argue the official policy is unconstitutional, "considerably more proof than the single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the [unofficial] 'policy' and the constitutional deprivation."  *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (internal footnote omitted) (footnote omitted).

To prove the inadequacy of the City's unofficial training policy, Cornelius points to Officer Bratcher's deposition where he was asked how many taser cycles are generally acceptable and he responded he was never trained on a "maximum number of trigger pulls" but that "until – what you're attempting to do . . . like his case, attempting to get him into handcuffs, . . . until that is

---

[12] The guidelines Cornelius references state: "**Officers must be trained to understand that repeated applications and continuous cycling of [Electronic Control Weapons] may increase the risk of death or serious injury and should be avoided**."  (Pl.'s Mot. Summ. J. Ex. 16, at 17, DN 68-18).  The guidelines explain officers should be trained to use a taser for "one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary."  (Pl.'s Mot. Summ. J. Ex. 16, at 22).  The guidelines also note that multiple or continuous cycling "resulting in an exposure longer than 15 seconds . . . may increase the risk of serious injury or death and should be avoided."  (Pl.'s Mot. Summ. J. Ex. 16, at 22).

18

done." (Pl.'s Resp. Defs.' Mot. Summ. J. 3 (citing Bratcher Dep. 59:1-8)).  Officer Bratcher went

on to say, "I mean, I guess you would have to draw a line somewhere, but to be honest with you,

I don't—I've never been in that situation." (Bratcher Dep. 59:11-13).  Even if this were evidence

that Officer Bratcher was inadequately trained on the use of a taser, one incident alone is

insufficient to impose *Monell* liability for an unconstitutional custom.  *See Connick v. Thompson*,

563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."

(citation omitted)).

      Cornelius also points to the testimony of the training officer at the time, Michael Huffman,

who said "Your training says that you—that you take—there is no limitations of cycles in the

training.  The training says that you do not apply the cycles beyond the need to safely apprehend

the suspect.  Now, the suspect controls that, right?" (Pl.'s Resp. Defs.' Mot. Summ. J. 3 (citing

Huffman Dep. 73:23-74:2, May 28, 2020, DN 68-12)).  Huffman went on to say, "it's limited until

the point that you can safely make the apprehension.  That's what limits it." (Huffman Dep. 74:13-

14).  Initially, Huffman's testimony does not seem to contradict the guidelines nor the law, which

recognizes there is no maximum *number* of discharges.[13]  *See Rudlaff v. Gillispie*, 791 F.3d 638,

641 (6th Cir. 2015) ("Our cases firmly establish that it is not excessive force for the police to tase

someone (even multiple times) when the person is actively resisting arrest." (emphasis added)

(citation omitted)); (*see also* Pl.'s Mot. Summ. J. Ex. 16, at 31).  Regardless, Cornelius has failed

to satisfy his obligation to put forward evidence showing the existence of a custom, let alone an

unconstitutional one.  The record is devoid of any evidence of prior misuses of tasers that could

---

[13] Cornelius' expert only proffered opinions as to the officer's conduct on the night of the incident, and the City's failure to supervise and investigate the incident.  (Notice Pl.'s Expert Disclosures Ex. 1, ¶ 35, DN 35-1).

be deemed to have put the City on notice of any deficiencies in training.  *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Liability based on a single violation must be accompanied by evidence that shows "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would be properly characterized as substantially certain to result." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 567 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Hays*, 668 F.2d at 874).  Huffman's testimony dispels such recklessness. Furthermore, it is undisputed that Officers Stump and Bratcher and Sergeant Morris all received use of force training, taser training, annual recertification, and training to deal with persons of diminished capacity.  (*See* Bratcher Dep. Ex. 8; Stump Dep. Ex. 3; Morris Dep. Ex. 6).  The Court, therefore, grants Defendants' motion on this claim.

As to the City's failure to supervise Officer Bratcher, Lisa Moore ("Moore") alleged that Sergeant Morris called her on the day of the incident to inform her that Cornelius had been "roughed up" and tased.  (Moore Dep. 30:20-25, May 10, 2019, DN 71-3).  Moore testified Sergeant Morris told her Cornelius was "lucky" that Officer Bratcher "didn't beat his ass" and left her with the "impression" that normally Officer Bratcher "would have beat [him] up", and that "Officer Bratcher is hotheaded."  (Moore Dep. 40:11-12, 42:3-4, 40:17-20).  Moore also had the "impression" that there may have been "prior incidents involving Officer Bratcher when he assaulted suspects without just cause", although she could not quote Sergeant Morris and conceded that she may have misunderstood him.  (Moore Dep. 40:8, 42:10-13, 42:17-19).  Sergeant Morris denies this version of the conversation.  (Morris Dep. 55:21-23).  The Sixth Circuit has held that failure to investigate complaints or to discipline officers can give rise to Section 1983 liability. *See Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989).  Moore's conversation with

Sergeant Morris and her "impression", however, is simply not evidence showing "several separate instances of the alleged rights violation," or showing a "history of widespread abuse that has been ignored . . . ." *Thomas v. City of Chattanooga*, 398 F.3d 426, 434 (6th Cir. 2005); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). It is undisputed that the City has no record that either Officer Stump or Officer Bratcher had any prior disciplinary issues, and Plaintiff has adduced no evidence of such. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 6). Accordingly, the Court grants Defendants' motion as to the negligent hiring and supervision claim.

### 2. *Failure to Investigate*

Cornelius also claims Defendants failed to investigate his incident, emboldening the type of conduct that caused his injury.[14] (*See* Pl.'s Mem. Supp. Mot. Summ. J. 22). At the time of Plaintiff's arrest, the City had a "Critical Incident Investigation" policy setting forth procedures when an injury results from the use of force. (*See* Pl.'s Mot. Summ. J. Ex. 13, DN 68-15). The policy requires witnesses be segregated, officers be removed from the scene, evidence be seized,

---

[14] Cornelius never articulated this claim until his summary judgment motion and response. "With limited exception . . . a party may not raise new claims or assert new legal theories during the summary judgment stage." *Clift v. RDP Co.*, 200 F. Supp. 3d 660, 674 (W.D. Ky. 2016), (citation omitted) *aff'd sub nom. Lyles v. RDP Co.*, 702 F. App'x 385 (6th Cir. 2017). The "nature of the notice requirement is much more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012) (citation omitted). The Complaint "contains little in the way of 'supporting facts'" for a claim that Defendants failed to investigate the incident. *Carter v. Ford Motor Co.* 561 F.3d 562, 565 (6th Cir. 2009). Cornelius seems to acknowledge this, as he explained that "[i]n developing this case, three major issues regarding the Defendant's supervision and training became apparent." (Pl.'s Resp. Defs.' Mot. Summ. J. 1). Regarding the failure to investigate claim, Cornelius "never added an allegation of that ilk to [his] pleadings. With this litigation now in the eleventh hour, [Cornelius] cannot expand [his] claims to include that new legal theory." *Clift*, 200 F. Supp. 3d at 674. Furthermore, "[t]o the extent [a party] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). As discussed above, however, the failure to investigate claim also fails as a matter of law.

21

and officer be given time to gather themselves before making a statement.  (*See* Pl.'s Mot. Summ. J. Ex. 13, at 2-4).  Sergeant Morris believed Cornelius' injuries were not caused by the officers use of force, but from Cornelius' seizure.  (Morris Dep. 37:8-14-18).  Sergeant Morris therefore did not initiate a "Critical Incident Investigation".  Chief Daugherty acknowledged he could not remember a time when there was a "Critical Incident Investigation" during his tenure from 2009 and 2019.  (Daugherty Dep. 48:23, Mar. 10, 2020, DN 65-7).  Sergeant Morris spoke with numerous officers and witnesses who arrived during and after the incident, but he did not take formal statements.  (*See e.g.*, Morris Dep. 17:4-6, 26:1-14).  Sergeant Morris stated Cornman also told him that Cornelius busted her lip, but he failed to document this with photographic or written evidence.  (Morris Dep. 18:6-13, 32:19-25).  The City also failed to preserve the officer's radio logs, which were requested by Cornelius.  (Pl.'s Mem. Supp. Mot. Summ. J. 14 n.13).

After the event, Officers Bratcher and Stump prepared separate incident reports indicating the taser was used only twice and that Cornman was a witness to the event.  (*See* Defs.' Mot. Summ. J. Ex. 2; Defs.' Mot. Summ. J. Ex. 3).  Sergeant Morris signed each and prepared his own "Response to Resistance Report" to the same effect.  (*See* Defs.' Mot. Summ. J. Ex. 4).  Training officer, Michael Huffman, and Chief Daugherty also signed off on the reports.[15]  After litigation commenced, the taser log was checked and noted to show the reports incorrectly listed the number

---

[15] Cornelius claims "Chief Daugherty stated the extent of his investigation would be reading the reports and making sure on their face the reports appeared reasonable."  (Pl.'s Mem. Supp. Mot. Summ. J. 16).  Chief Daugherty in fact said:

> Well, I would, of course, read through the report.  I may meet with the supervisors and the training officer involved in that . . . and they would advise me why they felt policies were followed and what—what areas that they covered and if there was a problem with something, you know . . . then if I want a further investigation, we would have ordered that and followed up with them.

(Daugherty Dep. 34:13-22).

of times Office Bratcher used the taser.  (Pl.'s Mot. Summ. J. Ex. 9).  Chief Daugherty indicated a discrepancy like this could trigger a secondary review.  (Daugherty Dep. 41:20).  Huffman stated he was not concerned about reopening an investigation, however, because he believed the officers responded appropriately based on in the incident reports, regardless of the evidence showing the number of shocks.  (Huffman Dep. 52:13-53:20).

The Sixth Circuit held "the failure to investigate an incident can be evidence of deliberate indifference." *Meirs v. Ottawa Cty.*, 821 F. App'x 445, 453 (6th Cir. 2020).  "The theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a 'ratification' of the officer's conduct." *Dyer v. Casey*, No. 94-5780, 1995 WL 712765, at *2 (6th Cir. 1995).  Cornelius points to Defendants' expert who admitted that omitting any witness statements from the Response to Resistance Reports amounted to false reporting.  (Pl.'s Mem. Supp. Mot. Summ. J. 23-24 (citing Meyer Dep. 111:11-14, Oct. 29, 2020, DN 68-13)).  Cornelius contends this shows the officers failed to accurately report the incident by failing to include Cornman's statements to Sergeant Morris, and that Chief Daugherty and Sergeant Morris failed to investigate the facial discrepancy.  (Pl.'s Mem. Supp. Mot. Summ. J. 23-24).  But, again, "a single instance of a failure to investigate, as alleged here, is insufficient to 'infer a policy of deliberate indifference.'" *Meirs*, 821 F. App'x at 453 (citation omitted).

Cornelius contends that because the City never conducted a "Critical Incident Investigation" during Chief Daugherty's tenure, it "ratified" and "emboldened" Cornelius' injury by encouraging the cover up of use of force violations, through a "look-the-other-way policy". (Pl.'s Reply Mot. Summ. J. 8, DN 72).  The Sixth Circuit recently clarified that "a claim based on inadequate investigation requires not only an inadequate investigation in this instance, but also a *clear and persistent pattern* of violations in earlier instances.  That is, there must be multiple earlier

23

inadequate investigations and they must *concern comparable claims*." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 495 (6th Cir. 2020) (emphasis added) (internal quotation marks omitted) (internal citation omitted) (citation omitted).  For example, in *Leach v. Shelby Cty. Sheriff*, the Sixth Circuit held the sheriff's failure to investigate mistreatment and punish those involved "ratified the unconstitutional acts", where there were "numerous similar incidents" of abuse in a two-year period.  *Leach*, 891 F.2d at 1248.  Without evidence of other similar incidents indicating the City failed to investigate or follow its own policies, Cornelius has failed to meet his burden on the failure to investigate claim.  The Court therefore grants summary judgment on Cornelius' claims against the City, Sergeant Morris, and Chief Daugherty.

## IV.   CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED** as follows:

1.     Defendants' Motion for Summary Judgment (DN 66) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's Eighth Amendment claim, and state law outrage, negligence, and abuse of process claims against Defendants Jessie Bratcher and Mike Stump are **DISMISSED WITH PREJUDICE**.  Plaintiff's Fourth Amendment claim and state law battery claim may continue.

2.     Defendants' Motion for Summary Judgment (DN 67) is **GRANTED**.  All claims against Defendants City of Mount Washington, Kentucky, Tim Morris, and Roy Daugherty are **DISMISSED WITH PREJUDICE**.

3.     Plaintiff's Motion for Summary Judgment (DN 68) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

July 21, 2021

cc:     counsel of record